A fatal accident with tragic consequences to all persons involved gave rise to this lawsuit. The victim was a little girl, Dora Jane Comer, aged seventeen months and the only child, at the time, of Robert W. Comer and Mrs. Essie Christine Hicks Comer, his wife, plaintiffs in the suit.
At about 2:40 p.m. on July 10, 1943, she was run over by an automobile owned and being driven by Reverend Van M. Dykes, her uncle, while he was backing it out of the driveway at the Comer home, 917 Mayflower Street in the City of Baton Rouge, where he and his wife also resided with the Comer family. The child was immediately taken in a car to the Baton Rouge General Hospital and died some fifteen minutes after arriving there.
The Travelers Insurance Company had issued a policy of public liability insurance on the car of Reverend Dykes and this suit has been instituted by Mr. and Mrs. Comer against that company, under the provisions of Act No. 55 of 1930, claiming damages for the death of their child in the sum of $15,000 each. Their demand is predicated on the alleged negligence of Reverend Dykes in several respects, all of which are denied by the defendant in its answer to their petition. Exceptions of vagueness and of no cause and no right of action had been previously disposed of and they are not urged before this court.
There was judgment in the court below in favor of the defendant and plaintiffs have taken and perfected this devolutive appeal.
The material facts in the case are not seriously disputed and liability against the defendant depends exclusively on the question of the negligence, vel non, of Reverend Dykes, under the facts and circumstances surrounding the accident as they appear from the record.
By a stipulation of counsel a photograph of the Comer home showing particularly the front porch and the concrete walk leading from the steps to the concrete driveway on which the car was parked at the time, together with minute measurements of the porch and walk, and also of the hedge directly in front of the porch, has been filed in the record, and this the court has found of great assistance in considering and analyzing the testimony of the various witnesses in the case.
The house is located in the 500 block of Mayflower Street and bears municipal No. 917 of that block. Mayflower Street runs east and west and the house faces south. The front porch measures 22.2 feet from east to west and 7.4 feet from north to south. The steps are on the east *Page 440 
end of the porch, and a person going up the steps from the sidewalk must take five steps, the fifth placing him on the front porch floor. The walk leading to the driveway connects with the walk leading from the steps to the sidewalk along the north side of Mayflower Street and this walk leading west to the driveway measures 19.7 feet in distance to the driveway. The width of the driveway itself is 7.6 feet. The average width of the hedge immediately in front of the porch is 6 feet and the distance from the south edge of the hedge to the north edge of the sidewalk on the north side of the street is 9.7 feet.
Reverend Dykes is a minister of the Baptist faith. Not long before this accident happened he had received an assignment to a church in St. Francisville, Louisiana. Apparently he had already begun his ministry but had not yet moved there. He was gradually moving some of his personal effects in his automobile and had been engaged in loading on the day of the accident. He did all the loading in the back yard of the residence and after he had finished he backed his car through a gate separating the back from the front yard and parked it on the driveway after having latched the gate, preparatory to his leaving. According to his testimony, which we believe is the most accurate on this point, the car was parked with the rear bumper just about flush with the south side of the hedge.
Mr. Comer and Reverend Dykes' wife were brother and sister. It does not appear how long they had been living together in this home but it is shown that their relations were most cordial and pleasant and it is also shown that Mr. Dykes was very fond of the Comer child who also seems to have been greatly attached to him. Reverend and Mrs. Dykes had a daughter by the name of Kathryn who had recently joined the Waves. She had previously been employed in some government capacity in Washington and in Detroit but had been with her parents a little over two months, living with them in the Comer home. She was a young lady over twenty-two years of age and she also seemed to have been very devoted to the child, Dora Jane.
The family had their dinner at the noon hour on the day of the accident and at about 2:30 Reverend Dykes was about ready to leave on his trip to St. Francisville. According to his testimony they drank coffee in the kitchen just before he left and he then walked through the hall with Kathryn, to the porch. The child followed them after they had stopped on the porch a second or two. He kissed them both good bye, when, he says, they were near the swing on the porch. That would have placed them on the west end, about three or four feet from the very end of the porch. He then walked to the steps, then down the steps to the walk then around the hedge and on to the car. When he reached the rear end of the car he looked back and towards the porch, to see if there was anything behind him, as he says he usually did, and as there was nothing he then proceeded to get into the car. He states positively that the child Dora Jane was not in the yard at that time. As he got into his car and sat at the driver's wheel, his daughter spoke to him from the porch and told him to be sure to tell the people in St. Francisville that she was sorry she was not going to see them before she left to go to New York which would be in a few days. He then says that she told him "good-bye and be good."
He then started the motor without difficulty and looked from his left side to the rear end of the car to see if the driveway was clear. He also looked to his right but was unable to see anything because the hedge on that side obstructed his view. Thinking that it was safe to do so he immediately started to move his car backwards. He says that he moved very slowly and is sure that he could have walked faster than the car was going at the time. As the car moved he says he heard a light bump which he thought was the noise from the scratching of the hedge against the car, but on second thought he stopped and as soon as he did his daughter turned and ran down the steps and as soon as she got on the ground she saw the child and screamed. That was the first cry he heard any one utter and he immediately stepped out of the car. She shouted to him to pull *Page 441 
up as the car was on the child. He jumped back in the car, pulled up three or four feet, stopped the car and when he saw what had happened he "went all to pieces." A neighbor, Mr. Luther Gillingham, who was sitting on the porch of the residence almost adjoining the driveway where the car was, ran to their assistance and he and Mrs. Dykes took the child to the hospital where, as already stated, it died within a few minutes.
The testimony of Miss Kathryn Dykes does not vary very much from that of her father except on the point as to the child being with them on the porch at the time he kissed them and bade them good bye. At first she says she does not remember that the child was with them but when her attention was called to a statement given by her to an adjuster of the insurance company shortly after the accident and in which it appears that she had said that her father came onto the porch and "chatted with us, and bade us good bye" she says that if she used the word "us" and there were two of them there at the time, "it was Dora Jane and I." We believe that on this point her testimony or rather her lapse of recollection was faulty and that her statement corroborates the testimony of her father to the effect that at the moment he bade them good bye and left them, the child was with her on the porch.
According to the measurements as given in the stipulation filed in the record, and assuming that Mr. Dykes was correct in stating that when he bade them good bye they were near the swing on the west end of the porch, that would mean that from that time he had to walk a distance of about 15 feet from the swing to the steps, then 5 paces down the steps, 6 feet across the width of the hedge to the walk leading to the driveway, then 19.7 feet along that walk to the driveway, and finally 7.6 feet across the driveway to the left rear end of his car, or a total of more than 48 feet, not including the five paces down the steps. It was after this that he stopped and looked towards the steps to see if there was anything to keep him from getting in his car and backing it out into the street. As he saw nothing after having walked that distance and after all those movements, it must have been obvious to him that the child had either remained on the porch with his daughter or else had gone into the house, in either of which events, he had a right to believe that she was in a place of safety, and that he could proceed in putting his car in motion in order to back it out to the street.
[1] In Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 2, § 1509, we find what may be said to be a rule of law pertinent to the situation that existed at the time Mr. Dykes entered his car and started backing it. The section contains the following statement: "If a driver has reason to anticipate that a child might be near his antomobile, it is his duty to see that the way is clear before starting the vehicle in motion, but, if he has no reason to anticipate presence of children near his car, negligence cannot be predicated on the mere fact that he started his machine, injuring the child."
The principal charge of negligence aimed at Mr. Dykes is that he was not careful enough, under the existing circumstances, in anticipating the acts of the child in this case. We agree with the statement which we have just quoted and by no means would we want to be understood as minimizing the duty of care which a driver of an automobile owes to children around and near his automobile. We also agree further that the driver should anticipate some unusual action on the part of children under such circumstances. But, as we understand the law, this rule applies in cases where a child is alone and unattended and not where it is with an adult who is in a position to easily take care of it.
[2] In Babbit, Motor Vehicle Law, at page 1349, Sec. 1861, in commenting upon the duty of care which an automobile driver must exercise with reference to children, it is stated that "Even in a private yard, where the driver knows that a child is playing there, he is under a duty to use care before starting the automobile." We thoroughly agree with that statement also *Page 442 
but it is apparent that by the very statement itself, the duty imposed upon the driver arises only when a child is playing in the yard and the driver is aware of his presence.
[3] In this case when Reverend Dykes last saw the child she was on the porch of the Comer home and, we would say constructively if not actually as far as he was concerned, in the care of his daughter, an adult person over twenty-two years of age. She was not playing in the yard nor was she anywhere near the automobile. He was further precautious however, for after he had walked down from the porch into the yard and up to his automobile, he again looked towards the steps to make sure that there was no danger of his backing his car. The child then was nowhere within his sight and it is our opinion that he then had the right to assume that she was safe and that he could set his car in motion as he intended to do.
It is urged however that he was negligent because after entering his car he continued speaking to his daughter who was on that end of the porch next to him and he should have sensed that her attention was not directed towards the child but was being all given to him. That conversation, according to the testimony of both did not amount to more than a few words as we have seen and the time that it took was so short that we do not think he should be held to have anticipated that meanwhile the child could have walked around to the steps and into the yard before he could have backed his car out.
Two witnesses who testified that they saw the child when it was actually being run over stated that they heard Miss Dykes scream and that at that moment the child was still from one and one-half to two feet from the rear right fender or back wheel. They are Miss Maxine Payne who lives almost across the street from the Comer residence and a young boy named Gene Boudreaux who lives next door to Miss Payne's residence and therefore somewhat diagonally across the street from the Comer home. Miss Payne testified that she was sitting in the living room of their home studying, and that she had a clear view across the street. She says that she glanced up from her studies and noticed Mr. Dykes when he was going to his car. She did not see the child at that time. She then went on with her studies and heard Kathryn scream. As she looked up she saw the child on the edge of the grass about a foot and a half or two feet from the car. In a few seconds the back bumper of the car had knocked her down and the wheel stopped on her stomach. She then saw the car move forward again and she saw Mr. Dykes get out. She then ran to the back of the house to call her mother and together they joined the number of people who had already reached the scene of the accident.
Gene Boudreaux was sitting on the front porch of his home. He also was reading a book. He glanced up and as he did so saw Mr. Dykes walking around the side of the house and then start his car. He began reading again and then heard someone scream. He looked up and then saw the child was between one and two feet from the car. He saw the car back and the wheel pass on the child. As he could not stand to look at such things he went into the house and called his mother.
It is urged that under this testimony Mr. Dykes' negligence further appears because even after he heard his daughter's outcry, at which time the child was still probably two feet away from the car, he should have stopped abruptly, as he could at the slow rate of speed at which the car was moving, and have avoided running over her. The testimony of Miss Dykes indicates however that she did not make her outcry until the child had actually been run over. This is partly corroborated by the testimony of Mr. Gillingham who said that although he did not see the accident he did hear a "bumping" when the car hit the child. After hearing this noise he says the car stopped right away and it was then that Miss Dykes ran down the steps to the back of the automobile, threw up her hands and screamed to her father to pull up. There is doubt in the testimony then whether Mr. Dykes received any alarm at all before the child was actually run *Page 443 
over and even were we to assume that he did, we do not think that in the very short space of two feet he would have had a chance to stop the car in time to avoid the accident.
Stress is also laid on the fact that this child was strongly attached to her uncle, that she followed him in and around the house and that he should have anticipated that she might have followed him to the car on this occasion. There might be some force in such an argument if the fact was that Mr. Dykes was alone with the child when he was leaving. As a matter of fact he testified that on other occasions when he left and they were alone, he called to someone to come and get her or else he left her inside the house and latched the front door. But on this occasion he left her when she was with his daughter and there was no necessity for him to take any such precaution as he certainly had a right to believe that his daughter could and would attend to her. Moreover Mr. Dykes' testimony is to the effect that notwithstanding the child's attachment to him and his devotion to her, and that she did follow him around, he could not recall that she had ever followed him to his automobile at any time and neither could Miss Payne, who also spoke of this attachment of the child to Reverend Dykes and of her following him around, recall ever seeing her follow him to his car; and according to her own testimony she rode with him daily for some time to and from work or school.
There is some testimony by Mrs. Comer to the effect that before Mr. Dykes was ready to leave she told him to let her know so that she could see about the child. Reverend Dykes however says that if Mrs. Comer told him any such thing he did not hear her and all the other facts and circumstances of the case indicate that no such request was made of him.
[4, 5] As was stated at the beginning, this was a most unfortunate and tragic accident, but in order to recover the damages which they seek from the defendant, it was necessary for these afflicted parents to prove negligence on the part of Mr. Dykes and that his negligence, in some respect, was the cause of the death of their child. This, the trial judge, in dismissing their suit, necessarily found they had failed to do. The law attaches much weight to his finding on such questions and in the absence of manifest error it becomes the duty of the appellate court to approve his findings. Our careful scrutiny of all the facts and circumstances fail to show any such error and under the law therefore, we are obliged to affirm his judgment.
For the reasons stated the judgment appealed from is affirmed and the appellants are to pay the costs of this appeal.